UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KATHERINE KENDRICK, )  | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:04-cv-0292-DFH-TAB |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Katherine Kendrick seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance benefits.  Acting for the Commissioner, Administrative Law Judge Peter Americanos determined that Mrs. Kendrick was not disabled under the Social Security Act because her severe impairment did not meet or medically equal any impairment listed in Subpart P, Appendix 1 of the regulations, and because she retained the residual functional capacity to perform her past relevant work.  Mrs. Kendrick contends that the ALJ erred in failing to find her depression a severe impairment, in assessing her credibility, in failing to account adequately for her impairments in his residual functional capacity finding, and in failing to weigh properly the opinion of her treating physician.  As explained below, the denial of

benefits is affirmed because the ALJ's decision complies with the law and is supported by substantial evidence.

*Background*

Katherine Kendrick was born November 19, 1974.  She was 24 years old on the alleged disability onset date of August 31, 1999, and was 28 years old when the ALJ denied her application for Social Security benefits in September 2003.  Mrs. Kendrick last met the disability insured status requirements of the Social Security Act on June 30, 2003.  She completed high school in 1993.  R. 276.  She has past work experience as an assistant manager of a gas station, cashier, waitress, driver, secretary, and laborer.  R. 41-43, 271.  Mrs. Kendrick testified that her physical problems included migraine and tension headaches, hand tremor, depression, and back pain.

1.    *Headaches*

Mrs. Kendrick testified that she awoke with a headache, sometimes mild and sometimes severe, "every single day."  R. 52.  She stated that she took methadone when she arose and would lie down for three to four hours.  If the methadone did not relieve her pain in four to five hours, she would take Lortab.  R. 52-54.  She claimed that on some days the medication would dampen the headache so she would feel like doing things, but that on other days she would remain on the couch all day.  R. 53.  She placed her pain at a level of 7-8 out of

10 on a "good day," and at a level of "15" on a "bad day."  R. 53-54.  She stated that on average she had four to five bad days in a week.  R. 55.

John Thomas, M.D., treated Mrs. Kendrick for her headaches from 1997 to 1999 and again from 2002 to 2003.  On July 15, 1997, Dr. Thomas reported: "In reviewing her chart, she does have a history of a neurologic workup back in 1992, CTs were negative and at that time she was diagnosed with stress headaches felt secondary to depression.  She was strongly advised for psychiatric counseling and antidepressants."  R. 173.  On July 27, 1999, Mrs. Kendrick told Dr. Thomas that she was having almost daily headaches, exacerbated by stress and tension at home and at work.  R. 141.  On August 30, 1999, Dr. Thomas reported that Mrs. Kendrick had almost daily migraines, "which have seemed to be coming on quicker and more intense."  R. 134.  He told her to avoid caffeine and other migraine triggers.  *Id.*

Mrs. Kendrick was under the care of neurologist Alan Summers, M.D., between 2000 and 2002.  R. 66, 412, 444-45.  Dr. Summers' impression upon examining Mrs. Kendrick on January 31, 2001, was that some of her headaches were migraine and some musculoskeletal.  Her neurological examination was normal.  R. 91.  He recommended that her medication regimen be simplified, that she decrease her caffeine intake, and that she get regular exercise and sleep.  R. 92.[1]

---

[1]The record contains little evidence of Dr. Summers' care of Mrs. Kendrick.

Dr. Thomas saw Mrs. Kendrick again on January 28, 2002, for the first time in at least a year.  R. 445.  She told Dr. Thomas she was having daily intractable headaches.  *Id.*  On March 19, 2002, she denied any change in her headaches or any new neurological symptoms.  R. 444.  On September 27, 2002, she told Dr. Thomas that "things are going fairly well," and denied any new neurological symptoms or other problems.  R. 410.  On December 12, 2002, Dr. Thomas reported:  "Headaches, seems to be doing fairly well."  R. 83.

Dr. Thomas indicated concern regarding Mrs. Kendrick's treatment with narcotic medications.  He stated on July 15, 1997: "There [are] some noncompliance issues and behaviors consistent with narcotic seeking."  R. 173. He stated on January 28, 2002 that she had "some problems with questionably abusive patterns to her narcotic use."  R. 445.  Dr. Thomas stated on August 30, 2002:  "Note should be made that she was under the care of Doctor Summers for about a year and a half to two years and was actually doing quite well and not seeking narcotics or calling us at all during that time.  It is just since he left the Clinic that she has been calling again."  R. 412.  Dr. Thomas stated on March 12, 2003:  "Would really like to get her off the narcotics and other therapy but without oral narcotics she requires frequent emergency room and Urgent Care visits for injectable forms so we are somewhat stuck between a rock and a hard place."  R. 81.

Other physicians expressed concern that Mrs. Kendrick's headaches were influenced by her medication regimen. Neurologist Robert Alonso, M.D., examined Mrs. Kendrick on April 12, 2002. R. 425-26. He stated: "the history and clinical examination of this patient is remarkable for the presence of chronic daily headache typical of that seen in the clinical setting of analgesic rebound or 'transformed' migraine. The patient's action tremor is typical of that seen in the clinical setting of Depakote/Amitriptyline administration. I have recommended Depakote, Amitriptyline, Zoloft, Imitrex, Esgic, and Lortab be discontinued." R. 426. Neurologist Wei Wang, M.D., examined Mrs. Kendrick on July 12, 2002. R. 434. Dr. Wang's impression was that she suffered from migraines and rebound headaches.[2]

Dr. Wang also reported on July 12, 2002 that Mrs. Kendrick had two different kinds of headaches. The first type was the chronic daily mild headaches. The second type was severe throbbing headaches that occurred once a week. Dr. Wang opined that the severe headaches were migraines. R. 434.

---

[2]Rebound headaches were explained by the medical expert during the administrative hearing. "Rebound headaches is a common phenomenon of taking medications like narcotics, sedatives, aspirin that suppress the headache, but don't really treat the cause of the headache. And as the medications wears off, you get a rebound of the headache, which is often worse than the original headache. So, you take more medication, you get more headaches. Then you take more medication, you take it more often, so you're either narcotized where you can't do anything and you're in a stupor. Or, your headaches just get dulled and then they come back worse and then they get dull and come back worse." R. 68.

Catherine Hatvani, M.D., treated Mrs. Kendrick with botulinum toxin ("Botox") injections on July 12, 2002 (R. 433), August 21, 2002 (R. 414), December 4, 2002 (R. 84), March 19, 2003 (R. 82, 204), and June 18, 2003 (R. 191-92). Mrs. Kendrick told Dr. Thomas on August 30, 2002 that the Botox injections offered some relief but not complete relief. R. 412. On December 12, 2002, Dr. Thomas reported: "She states the Botox certainly seems to help and for about three days following her last injection she was completely headache free and they have been more mild since then. . . . She states that she is fairly pleased with the level of pain control on the current regimen." R. 83.

On March 12, 2003, Dr. Thomas reported: "The patient comes in today for follow up of migraine headaches. She states she is doing fairly well. . . . She states the headaches do seem to be more tolerable. She states she still has constant, daily headaches but she has learned to accept and deal with them better. She states on most days she is able to do light household chores but at some point during the day she is required to lay [sic] on the couch due to the intensity of the headaches." R. 81. On June 11, 2003, Dr. Thomas stated that Mrs. Kendrick had recently been referred to the Diamond Headache Clinic, but that she was unhappy with the meeting. R. 193. The Clinic had recommended weaning her off narcotic medications, but Mrs. Kendrick was "adamant that the medications are not causing her problem and they are actually the only things that help her function." *Id.* Dr. Thomas also reported: "She really is not very

functional according to her husband.  She spends most days lying on the couch, not caring for the children or doing housework."  R. 193.

Mrs. Kendrick visited the emergency rooms at St. Elizabeth Medical Center or Lafayette Home Hospital seeking relief from headaches on January 15, 1998 (R. 487), August 29, 1999 (R. 356-57), May 17, 2000 (R. 473), October 8, 2000 (R. 483), December 5, 2000 (R. 344-45), January 17, 2002 (R. 465-66), February 25, 2002 (R. 467-68), March 18, 2002 (R. 462-63), December 26, 2002 (R. 318-19), and February 25, 2003 (R. 316-17).  She also visited Urgent Care at Arnett Clinic on November 28, 2000 (R. 95), November 30, 2000 (R. 93), October 11, 2002 (R. 418), December 23, 2002 (R. 88), and December 24, 2002 (R. 87).  CT scans of Mrs. Kendrick's head on April 27 and October 26, 2001, were normal.  R. 454-55, An April 18, 2002 MRI of her brain also was normal.  R. 320.

The record indicates that Mrs. Kendrick's headaches had an emotional component.  Psychologist Greg Lamberty, Ph.D., conducted a clinical interview of Mrs. Kendrick and administered the Minnesota Multiphasic Personality Inventory, 2d Edition ("MMPI-2") on November 7, 1997.  R. 151, 155.  Dr. Lamberty noted that Mrs. Kendrick had a history of depression, which was being treated by Paxil. The doctor found that the MMPI-2 should be interpreted with caution in her case since the test suggested that she tried to "pass herself in a more favorable light than is realistic" and "is loathe to admit the presence of any psychological distress or 'weakness.'"  R. 151.  Dr. Lamberty continued:

Mrs. Kendrick shows a clear pattern of somatization. She reports a very large number of rather vague somatic complaints including, obviously, headaches. Her absolute level of depressive symptomatology is clinically significant, though this is overshadowed by her physical symptoms. The patient shows relatively poor insight with respect to the psychological underpinnings of her problems. Which basically means that she prefers simple answers that may be wrong to more complicated answers that are more difficult to understand and accept. This appears to be a pattern that is evident in her headache symptomatology. There does not appear to be any attempt to mislead her doctors as she has consistently reported her symptoms as the same without embellishment. All of her exams have been non-focal, and suggestive of chronic tension headache as opposed to a classical migraine variant. It is noteworthy that patients with an MMPI-2 profile like Mrs. Kendrick's tend not to refer themselves for help with psychological concerns. Their work record is usually adequate.

* * *

Katherine Kendrick appears to be suffering from a fairly chronic depressive illness. In addition, there are a number of personality disorder features (mainly avoidant PD) that keep her from addressing the underlying reasons for her chronic problems. . . .

R. 151. Dr. Lamberty also opined that the occurrence and/or severity of Mrs. Kendrick's headaches were correlated with family and interpersonal stressors. He believed that her headaches were primarily tension headaches, and he recommended that she undergo counseling as a means to improve her pain problems if she became "open to this course at any time in the future." R. 155.

2.   *Depression*

Dr. Lamberty stated on November 7, 1997 that "Katherine Kendrick appears to be suffering from a fairly chronic depressive illness." R. 151. Jayati Singh,

M.D., diagnosed her with major depression, recurrent and of moderate severity, on June 19, 2002.  R. 423.  Dr. Singh noted that Mrs. Kendrick seemed overwhelmed by her current situation.  He prescribed Effexor, and recommended individual psychotherapy to help her cope with stressors.  R. 423-24.

Dr. Thomas saw Mrs. Kendrick for depression on May 1, May 14, and June 11, 2003.  R. 193, 196, 201.  In his report after the June 11th visit, Dr. Thomas noted:  "She was markedly depressed about a month ago and we increased her Prozac and she was doing better.  Certainly I have a fear that she will have a major relapse if we do not keep her on some antidepressant so we encouraged her to restart her Prozac at 20mg a day.   She expressed understanding and agreement."  R. 193.

3.    *Hand Tremor*

Mrs. Kendrick was diagnosed with Hereditary Essential tremor around 1999.  R. 47-49.  This impairment caused her hands to shake.  She testified that on an average day, she dropped something at home such as plates or cups.  *Id.* She did not take medication for the tremor.  R. 50.

4.    *Back Pain*

Mrs. Kendrick visited the emergency room at St. Elizabeth Medical Center on September 20, 2000, seeking relief from low back pain.  R. 485-86.  Dr. Thomas saw Mrs. Kendrick on September 25, 2000 for low back pain.  R. 236.  A physical exam showed normal gait, heel and toe walking, and a negative straight leg raise test.  *Id.*  Dr. Thomas' impression was possible disc herniation with persistent pain despite anti-inflamatories and muscle relaxants.  *Id.*  Dr. Thomas saw her again for low back pain on October 3, 2000, and stated:  "The degree of pain does not seem to coincide well with her clinical exam."  R. 229.  An MRI of the lumbar spine on October 4, 2000 was normal, revealing no evidence of significant disc pathology or nerve root compression.  R. 484.

5.    *State Agency Assessment and Review*

Medical consultant Dr. Lopez completed a physical residual functional capacity assessment of Mrs. Kendrick on September 10, 2002.  R. 385-92.  Dr.

Lopez indicated no exertional, manipulative, visual, or communicative limitations. He indicated postural limitations, particularly with respect to climbing, and environmental limitations with respect to hazards. R. 387, 389. The Psychiatric Review Technique indicated that Mrs. Kendrick had an affective disorder but that her impairment was not "severe" within the meaning of the Social Security Act. R. 393-405. The Review also indicated that she had no functional limitations due to the disorder. R. 403.

6.     *Procedural History*

Mrs. Kendrick applied for disability insurance benefits on July 24, 2002. Her claim was denied initially and on reconsideration, and Mrs. Kendrick filed a timely request for a hearing before an ALJ. Mrs. Kendrick appeared and testified at a hearing held on July 16, 2003 before ALJ Peter Americanos. Michael Blankenship testified as a vocational expert and Mark Farber, M.D., testified as a medical expert. The ALJ issued a decision on September 22, 2003 finding Mrs. Kendrick not disabled. The Appeals Council denied review on December 24, 2003. Thus, the ALJ's decision is treated as the final decision of the Commissioner. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

*The Statutory Framework for Determining Disability*

To be eligible for the disability insurance benefits she seeks, Mrs. Kendrick must establish that she was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death or that had lasted or could be expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 423(d).   Mrs. Kendrick could establish disability only if her impairments were of such severity that she was unable to perform not only the work she had previously done, but also any other kind of substantial work existing in the national economy. 20 C.F.R. § 404.1520(f) and (g).

This eligibility standard is stringent.   The Act does not contemplate degrees of disability or allow for an award based on partial disability.   *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).   The Act provides important assistance for some of the most disadvantaged members of American society.   But before tax dollars – including tax dollars paid by others who work despite serious and painful impairments – are available as disability benefits, it must be clear that a claimant has an impairment severe enough to prevent her from performing virtually any kind of work.   Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The implementing regulations for the Act provide the familiar five-step process to evaluate disability.  See 20 C.F.R. § 404.1520(a)(4).  The steps are as follows:

    (1)    Is the claimant engaged in substantial gainful activity?  If so, she is not disabled.

    (2)    If not, does the claimant have a severe impairment or combination of impairments?  If not, she is not disabled.

    (3)    If so, does the impairment meet or equal an impairment listed in the regulations?  If so, the claimant is disabled.

    (4)    If not, can the claimant do her past relevant work?  If so, she is not disabled.

    (5)    If not, can the claimant perform other work in the national economy given her residual functional capacity, age, education, and experience?  If not, she is disabled.

When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

At step one, the ALJ found that Mrs. Kendrick probably had engaged in substantial gainful activity since her alleged onset date.  R. 12.  Beginning August or September 2001, she worked 16 hours a week at $5 per hour as a cashier at a gas station.  In November she began working 30 to 35 hours a week at the station and was earning $300 per week until March 2002.  She began working as a waitress in late November or early December 2002 and continued to work part-time, four days a week and four hours per day.  See R. 43-47, 83, 241-42, 248,

250.  The ALJ found that her earnings during those periods intermittently were at a level showing substantial gainful activity.

Normally, evidence of substantial gainful activity would preclude a finding of disability.  20 C.F.R. §§ 404.1520(a)(4)(i), 1520(b), 1571, 1572.  However, the ALJ assumed for the purposes of the decision that Mrs. Kendrick did not engage in substantial gainful activity on a consistent basis, and he moved on to step two.

At step two, the ALJ found that Mrs. Kendrick had a "severe" impairment of migraine and tension headaches.  The ALJ found that her impairments of hereditary hand tremor, depression, and back pain were not "severe" under the regulations.  This finding was sufficient to satisfy step two.  At step three, the ALJ found that Mrs. Kendrick's impairments did not meet or equal any of the listed impairments in Subpart P, Appendix 1 of the regulations.  At step four, the ALJ found that Mrs. Kendrick was able to perform her past relevant work as a cashier.  This finding at step four ended the sequential evaluation.  R. 19-20.

### Standard of Review

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court.  42 U.S.C. § 405(g); *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v.*

*Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000); *Luna*, 22 F.3d at 689.  The court must examine the evidence that favors the claimant as well as the evidence that supports the Commissioner's conclusion.  *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of that conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  To affirm the ALJ's ruling, the court also must be convinced "that the ALJ considered the important evidence, [and] that the reasons he provided 'build an accurate and logical bridge between the evidence and the result.'"  *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999), quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

*Discussion*

Mrs. Kendrick advances four arguments for remand:  (1) the ALJ erred in failing to find her depression a severe impairment; (2) the ALJ erred in assessing her credibility; (3) the ALJ erred in failing to adequately account for the severity of her headaches and their emotional component in his residual functional capacity finding; and (4) the ALJ erred in failing to properly weigh the opinion of her treating physician.

I.    *Claimant's Depression*

Mrs. Kendrick's claim regarding the ALJ's analysis at step two consists of two sentences:  "The [ALJ] did not find Plaintiff's depression as severe.  Plaintiff argues that the record is clear that there is an emotional component to the headaches."  Pl. Br. 20 at 6.  The record supports the second sentence of her claim – *i.e.*, there was an emotional component to her headaches.  See R. 151, 155.  That evidence does not compel a conclusion that her depression was "severe" as defined under the regulations.  Also, plaintiff simply has not developed a coherent legal argument that the ALJ erred on this point.  See also Pl. Br. 20 at 18.  The court is not responsible for developing a party's argument for her.

In any event, the court sees no error on this issue.  A "severe" impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 404.1521; see also § 404.1520a(c)(2)

-16-

(providing that when evaluating whether a claimant's mental impairment is severe, the Commissioner "will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis"). The ALJ found at step two that Mrs. Kendrick's headaches constituted a "severe" impairment but that her depression did not.

The record indicates that Mrs. Kendrick's headaches, her tension, and probably her depression were related. Her examining physicians recognized that successful treatment of her headaches depended in part on reducing her daily stressors. Although Mrs. Kendrick's emotions may have found expression in her physical symptoms of headaches, there is no evidence in the record that her depression, as distinct from her headaches, imposed any additional physical or mental limits on her ability to do basic work activities. The record evidence is to the contrary.

The Psychiatric Review Technique Form indicated that Mrs. Kendrick had no functional limitations due to her non-severe affective disorder. R. 19, 393-405. Dr. Singh found in his June 2002 psychiatric assessment that she had no psychomotor abnormality; she also had speech within normal limits, linear and logical thought processes, no suicidal ideation, no delusions, good judgment, and attention, concentration, and memory span within normal limits. R. 422-24. The ALJ considered this evidence in his decision. R. 15.

The ALJ's finding that Mrs. Kendrick's headaches constituted a severe impairment but that her depression did not is supported by substantial evidence in the record.  The record indicates that if her headaches were unrelated to her depression, the headaches would still significantly limit her physical or mental ability to do basic work activities, but her depression by itself would not impose such limitations.

II.     *Credibility Determination*

Mrs. Kendrick argues, "The [ALJ] did not conduct any credibility analysis as required in Social Security Regulations and the Social Security Rulings."  Pl. Br. 20 at 22, ¶ 37.  The court disagrees.

When assessing a claimant's credibility, the ALJ must consider the degree to which a claimant's allegations of pain and other symptoms are consistent with the objective medical signs, opinions by treating or examining physicians, laboratory findings, history, and treatments.  In addition to the objective medical evidence, the ALJ must consider the following factors:

1.     The claimant's daily activities;

2.     The location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

4.     Information about the claimant's medications to alleviate symptoms;

5.      Treatment that the claimant receives for relief of symptoms;

6.      Any other measures the claimant takes to relieve his symptoms;

7.      Any other factors concerning the claimant's limitations.

Social Security Ruling 96-7p.  Although the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence, the ALJ may discount subjective complaints that are inconsistent or conflicting with the evidence as a whole.  *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); Social Security Ruling 96-7p.

Ordinarily, a reviewing court defers to an ALJ's credibility determination. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).  The general rule is that absent legal error, an ALJ's credibility finding will not be disturbed unless "patently wrong."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995).  The ALJ also must adequately articulate the reasons behind a credibility finding.  *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); Social Security Ruling 96-7p.  An ALJ is obligated by SSR 96-7p to go beyond a conclusory statement that a claimant's allegations are not credible. See *Brindisi*, 315 F.3d at 787-88.

The ALJ complied with the law.  The ALJ found that Mrs. Kendrick's "allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision."  R. 20, ¶ 5.  In the body of the decision, the ALJ

-19-

stated: "In evaluating the claimant's testimony, in light of the objective evidence of record, I do not credit her allegations of pain and/or other functional limitations so severe that she cannot work." R. 17. The ALJ then referred to numerous exhibits from the record to support his finding. R. 17-18. The ALJ also discussed Mrs. Kendrick's pain, aggravating factors, medications, and treatments in other parts of the decision. R. 13-17.

The ALJ highlighted inconsistencies between Mrs. Kendrick's allegations of disabling pain and her physicians' reports. The ALJ set forth some of Mrs. Kendrick's claims:

> Mrs. Kendrick testified that she has chronic headaches. She stated that on a good day, with medications, her pain is at a level of 7-8/10, and on a bad day, her pain is at a level of 15. She indicated that she had four or five bad days a week. She said she must lie down three or four hours a day. She said she never goes to restaurants, but she drives, reads mystery novels, and cares for three children.

R. 17. The ALJ must consider the degree to which Mrs. Kendrick's claims are consistent with the medical signs, history, treatment, and opinions by treating or examining physicians, and the ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole. SSR 96-7p.

The ALJ, in weighing Mrs. Kendrick's claims, referenced Dr. Summers' January 31, 2001 report that her neurological examination was normal (R. 89-91); Dr. Thomas' report on January 28, 2002 that upon physical examination she

appeared to be in no apparent distress (R. 445); Dr. Thomas' August 30, 2002

report that she had done quite well under the care of Dr. Summers for about a

year and a half to two years (R. 412); Dr. Thomas' December 12, 2002 report that

she seemed to be doing fairly well, that she had been working as a waitress for a

week but was tolerating it well, and that the biggest goal was to control pain

enough so she could work and she seemed to be working (R. 83); a physician's

note at Arnett Clinic's Urgent Care on December 24, 2002 that she was in "mild"

distress although she complained of a severe migraine headache (R. 87-88); and

Dr. Thomas' reports that she had some questionably abusive patterns to her use

of narcotic pain medications and exhibited drug seeking behavior (R. 173, 193,

445).  R. 18.[3]


    The ALJ also noted inconsistencies between Mrs. Kendrick's claims of

disabling pain and her descriptions of her daily activities.  The ALJ discussed the

evidence indicating that she did typical work around the house, including

cleaning, moving things around, and lifting children; was independent in all

activities of daily living; prepared her children's breakfasts, bathed and dressed

_____

    [3]In discussing why he found Mrs. Kendrick's subjective allegations of
headache pain and limitations not supported by the record, the ALJ stated: "Dr.
Thomas stated on October 3, 2000, that the claimant's degree of pain did not
seem to coincide well with her clinical examination."  R. 18, citing R. 229.  The
Commissioner referred to this statement in her brief.  Def. Br. at 11.  Mrs.
Kendrick correctly points out that this statement concerned her low back pain
rather than her headaches.  Pl. Reply Br. 28 at 4.  However, removal of this one
sentence from the ALJ's discussion of Mrs. Kendrick's credibility does not render
his credibility determination or his articulation of that determination defective.
Within the same paragraph, the ALJ referred to a substantial amount of other
evidence supporting his finding.  R. 17-18.

them, cooked, did laundry, did lawn work, read, vacuumed, dusted, washed dishes, cleaned nine rooms total, drove, and went grocery shopping.  R. 18, 55-58, 251, 425.[4]

The ALJ also highlighted inconsistencies between Mrs. Kendrick's different descriptions of her limitations.  The consistency of a claimant's statements about activities or limitations made at different times is another indicator of credibility. SSR 96-7p.  The ALJ referenced Mrs. Kendrick's statement on May 28, 2002 that she was not having migraine headaches daily but still had daily tension type headaches (R. 438); her statement to Dr. Thomas on September 27, 2002 that she was doing fairly well and she seemed to be fairly pleased with the care she was receiving (R. 410); her statement to Dr. Thomas on December 12, 2002 that she was fairly pleased with the level of pain control on her current medication regimen (R. 83); her statement to Dr. Thomas on March 12, 2003 that she was doing fairly well, and that although she still had daily headaches, she had learned to accept and deal with them better (R. 81); and her statement to Dr. Thomas on May 14, 2003 that overall things were going well (R. 196).  R. 18.

_____

[4]Mrs. Kendrick argues that although she reported that she did housework and cared for her children, the ALJ did not account for her reports that it normally took all week to clean her house because she could not do these activities when she had a headache.  She argues that when her headache pain increased she had to stop what she was doing and lie down, or get other individuals to help her.  R. 251, 254.  Mrs. Kendrick claims that none of her testimony and written statements suggest the ability to sustain work on an ongoing basis.  Pl. Br. 20 at 21, ¶ 33.  These claims, however, are similar to those recited and discounted by the ALJ in his credibility determination; *e.g.*, "She said she must lie down three or four hours a day."  R. 17.

Finally, the ALJ stated that he discounted Dr. Thomas' opinion that Mrs. Kendrick could not work because she worked part time to full time intermittently after her alleged onset date, and she cared for a house and three children.  As of January 2003, she still worked part time as a waitress.  R. 241-45.

The medical expert, Dr. Farber, testified that he found no physical limitation in the record.  R. 67.  Dr. Farber highlighted for the ALJ two pieces of evidence. First, he noted the evidence that Mrs. Kendrick's headaches were partly "rebound" headaches.  R. 66.  Second, he noted Dr. Thomas' statement of August 20, 2002 that when Mrs. Kendrick was under the care of Dr. Summers she was doing quite well.  R. 66, 412.  Dr. Farber opined that "the record would indicate that if the right person were managing the headaches, that they can be dealt with effectively."  R. 66-67.

In sum, the ALJ's credibility determination is supported by substantial evidence in the record, and the ALJ gave a sufficient explanation of his credibility determination.

III.    *Residual Functional Capacity Assessment*

The ALJ found that Mrs. Kendrick retained the residual functional capacity for light work, with 10 days off per year, avoiding jobs with high stress levels.  R. 19, 73.  The vocational expert testified that a hypothetical individual with this

residual capacity could return to Mrs. Kendrick's past work as a cashier.  R. 19, 73-74.

Mrs. Kendrick argues that the ALJ erred at step four in failing to account adequately for the severity of her headaches and their emotional component in his residual functional capacity finding.  Pl. Br. 20 at 6-7.  She also argues that the ALJ's finding was not supported by any medical opinion in the record.  Pl. Br. 20 at 20, ¶ 27.  The Commissioner argues that the ALJ's residual functional capacity assessment accommodated Mrs. Kendrick's physical and psychological limitations by specifying that she should be allowed 10 days off each year and should be limited to low-stress jobs.  The court agrees with the Commissioner.

If a claimant's past relevant job did not require her to perform activities in excess of her residual functional capacity, she will be found not disabled. 20 C.F.R. § 404.1520(e).  With respect to the stress limitation, the record indicates that Mrs. Kendrick's headaches were at least exacerbated by stressors at home and at work.  Dr. Lamberty opined in 1997 that her headaches were tension related and reflected a pattern of somatization.  R. 151, 155.  In 2002, Dr. Singh recommended individual psychotherapy to help her cope with stressors.  R. 423-24.  An assessment limiting Mrs. Kendrick to low-stress jobs is reasonably calculated to accommodate the link between her headaches and tension.  Mrs. Kendrick has presented no evidence that her past work as a cashier would constitute a high-stress job.

Mrs. Kendrick reported that during the time she worked as a cashier and a waitress, she missed several days of work because of her headaches.  R. 43, 241, 248.  The ALJ's residual functional capacity finding accommodated her need to miss days of work due to headaches.  At the administrative hearing, the ALJ posed a hypothetical question to Mr. Blankenship that included a limitation that Mrs. Kendrick have the opportunity for 10 days off of work per year.  Mr. Blankenship stated that there would be a large number of jobs in Indiana, including 19,403 cashiering positions, that could accommodate that limitation "because 10 days a year would not be an uncommon number when you look at potential vacation days and sick days."  R. 73.  The ALJ then clarified the limitation:  "Assume that this hypothetical individual must be allowed to take 10 days off in addition to the regular days that normally employees are entitled."  R. 75.  Mr. Blankenship testified that the clarified limitation would not significantly change his testimony as to the number of available jobs.  "If a person had established themselves then they should be able to utilize vacation and other time off to the degree that they might utilize 24 days a year in my opinion.  But certainly, not all of them in the month of January."  R. 75.  The ALJ reasonably relied on the vocational expert's opinion that Mrs. Kendrick would be able to take at least 10 days off work per year in her previous job as a cashier to accommodate the physical effects of her headaches.

The ALJ's finding as to Mrs. Kendrick's residual functional capacity is supported by substantial evidence in the record, and accounts for her psychological and physical limitations.

IV.   *Opinion of Treating Physician*

In her reply brief, Mrs. Kendrick argued that the ALJ improperly failed to give significant weight to the March 12, 2003 opinion of her treating physician, Dr. Thomas.  Pl. Br. 28 at 2-3.  Issues or requests raised for the first time in a reply brief are deemed waived.  *E.g.*, *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 325 (7th Cir. 1995); *Swanson v. Apfel*, 2000 WL 1206587, *4 (S.D. Ind. Aug. 7, 2000) (disability claimant had waived issues by not raising them before reply brief).  There were some indirect allusions to the issue in Mrs. Kendrick's opening brief, see Pl. Br. 20 at 19-20, but not enough to put the Commissioner fairly on notice that she was challenging the ALJ's analysis of her treating physician's opinion of disability.  See, *e.g.*, *Tenner v. Zurek*, 168 F.3d 328, 330 (7th Cir. 1999) (single sentence on a point, not developed into a cognizable argument, is treated as a waiver); *Border v. City of Crystal Lake*, 75 F.3d 270, 274 (7th Cir. 1996) (perfunctory and undeveloped arguments are waived).

Even if Mrs. Kendrick had properly raised the issue, it has no merit.  Dr. Thomas stated in a letter:

> Katherine Kendrick has been my patient for a number of years. During that time she has had chronic daily headaches. Intermittently we have had varying degrees of controlling these but for the last year to year and a half they have really been disabling. At least once per day she has an occasion where the headache is so severe she is required to lie on the couch in a dark room and unable to do even simple activities. She has been evaluated by numerous neurologists and is currently undergoing treatment. She has been compliant with medication plans but has been unable to control the headaches beyond their current state. Certainly the long-term goal would be to establish a medical regimen which would control her headaches and enable her to return to work. Unfortunately at this time that is not the case.

R. 80.

> The ALJ discussed and discounted Dr. Thomas' opinion in his decision:

> Dr. Thomas reported on March 12, 2003, that the claimant had chronic daily headaches which were not controlled to the point that she could return to work at that time (Ex A at 1). I do not accept Dr. Thomas' opinion that the claimant could not work. She worked part-time to full time intermittently since her onset date, and she cares for a house and three children.

R. 19. Mrs. Kendrick contends that Dr. Thomas' statement means that she suffered from significant headaches that greatly affected her functioning, and that this statement was a medical assessment and not a legal one. Pl. Br. 28 at 3, ¶ 10. The ALJ did not err in discounting Dr. Thomas' opinion.

In the first part of his letter, Dr. Thomas stated that Mrs. Kendrick had chronic daily headaches, and that for the last year to year and a half they had been "disabling," in that at least once per day her headache was so severe she was

-27-

required to lie on the couch in a dark room and was unable to do even simple activities. Dr. Thomas also discussed her treatments for the headaches. This first part of the letter discussed the nature and severity of Mrs. Kendrick's headaches. A treating physician's medical opinion on the issue of the nature and severity of an impairment is entitled to controlling weight if well supported by medical signs and laboratory findings and not inconsistent with the record as a whole. 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p. However, Dr. Thomas' statement that Mrs. Kendrick's headaches required her to lie on the couch every day simply reiterated Mrs. Kendrick's allegations of her limitations due to headache pain, allegations which the ALJ considered in his credibility determination. An ALJ is not required to adopt a statement by a physician based entirely on a claimant's allegations. *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989).

The last two sentences of the letter stated that Mrs. Kendrick was not then able to return to work. This is the part of Dr. Thomas' opinion that the ALJ directly discounted: "I do not accept Dr. Thomas' opinion that the claimant could not work." R. 19. A claimant's ability to work is an issue that the law reserves for the Commissioner. Social Security Ruling 96-5p. A treating physician's opinion on such issues is not entitled to controlling weight or special significance, although the ALJ must consider the opinion. 20 C.F.R. § 404.1527(e); SSR 96-5p. The ALJ thus was entitled to discount Dr. Thomas' opinion of Mrs. Kendrick's ability to work based on inconsistencies with the record. The record indicates that

the ALJ properly considered and weighed Dr. Thomas' opinion, and that the ALJ's weighting of that opinion is supported by substantial evidence.

*Conclusion*

The ALJ in this case found that Mrs. Kendrick's impairments did not establish disability under the law.  Because the ALJ's decision is supported by substantial evidence and complies with the law, the decision is affirmed.  Final judgment will be entered accordingly.

So ordered.

Date: April 18, 2005

                                        _____
                                         DAVID F. HAMILTON, JUDGE
                                         United States District Court
                                         Southern District of Indiana

Copies to:

James F. Roth
jim@jimrothlaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov